fee *pd*
# 5830-AA

## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN

EASTMAN OUTDOORS INC.,

**FILED**

OCT 1 9 2005

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

Plaintiff,

-vs-

ARCHERY TRADE ASSOCIATION,
EASTON TECHNICAL PRODUCTS, INC.,
HOYT USA, INC., EASTON-HOYT, LLC,
JAY MCANINCH, ERIK WATTS,
TODD R. VAALER, and LAVERNE WOOCK,

Defendants.

**05-74015**

Case No.
Hon.

MARIANNE O. BATTANI

**Complaint and
Jury Demand**

VIRGINIA MORGAN

---

### COMPLAINT

Plaintiff, Eastman Outdoors Inc. ("Eastman") for its complaint against the defendants, states:

### I. Jurisdiction and Venue

1. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 & 1137, because this action arises in part under the Sherman Antitrust Act, 15 U.S.C. § 1, et seq.

2. Venue is appropriate in this judicial district under 28 U.S.C. 1391(a)(2) because the claim that is the basis of this suit accrued in whole or in part in this district.

### II. Parties

3. Plaintiff Eastman Outdoors is a corporation organized and existing under Michigan law. Its principal place of business is 3475 Eastman Drive, Flushing, Michigan.

4. Defendant Archery Trade Association ("ATA") is a corporation organized and existing under Virginia law. Its principal place of business is 6044 Rockton Court, Centreville, VA 20121 and it has its many directors, board members, and regular members spread throughout the United States, including Michigan. ATA may be served with process

under Federal Rules of Civil Procedure 4(d) or 4(h) by serving an officer, managing or general agent, or any other agent authorized by appointment or law, at that address. The ATA is a voluntary association of competitors in the archery industry.

5.   Defendant Easton Technical Products, Inc., ("Easton") is a corporation organized and existing under Utah law. Its principal place of business is 5040 W. Harold Gatty Dr., Salt Lake City, Utah 84111.

6.   Defendant Hoyt USA, Inc., ("Hoyt") is a corporation organized and existing under Utah law. Its principal place of business is 543 N. Neil Armstrong Rd., Salt Lake City, Utah 84116.

7.   Defendant Easton-Hoyt, LLC, ("Easton-Hoyt") is a corporation organized and existing under Utah law. Its principal place of business is 5040 W. Harold Gatty Dr., Salt Lake City, Utah 84111.

8.   Defendant Jay Meaninch, is the Chief Executive Officer/President of ATA, and upon information and belief, an officer and/or director of Easton, and resides in Salt Lake City, Utah.

9.   Defendant Erik Watts, is an ATA Executive Committee Person, and upon information and belief, an officer and/or director of Hoyt, and resides in Salt Lake City, Utah.

10.   Defendant Laverne Woock is a Executive Committee Person of ATA, and upon information and belief, an officer and/or director of Delta Industries, an ATA member, and resides in Reinbeck, Iowa, 50669.

11.   Defendant Todd R. Vaaler is a Executive Committee Person of ATA, and upon information and belief, an officer and/or director of Gateway Feathers, and resides in

-2-

Douglas, Arizona, 85607.

### III. Common Allegations

12.    Eastman is in the business of manufacturing and selling hunting equipment, to include, but not limited to carbon arrows.  Eastman sells approximately 20 percent of the arrows sold in the United States.

13.    Defendants Easton, Hoyt, and Easton-Hoyt manufacture and sell hunting equipment, to include aluminum arrows, and most recently carbon arrows.  Said defendants sell approximately 50 percent of the arrows sold in the United States.

14.    Defendants Easton, Hoyt, and Easton-Hoyt is a family of companies who are fierce competitors with Eastman, as said Defendants and Plaintiff all manufacturer and sell arrows.

15.    The ATA has enacted bylaws.  The ATA bylaws are attached hereto as Exhibit A and contain the following language with regard to member suspension:

Section 4.06. Suspension of Membership. A member may be suspended under Section 4.07 of these Bylaws, based on the good faith determination by the Board, or a committee or person authorized by the Board to make such a determination, that the member has failed in a material and serious degree to observe the Corporation's rules of conduct, or has engaged in conduct materially and seriously prejudicial to the Corporation's purposes and interests. A person whose membership is suspended will not be a member during the period of suspension.

Section 4.07. Procedure for Expulsion or Suspension. If grounds appear to exist for expulsion or suspension of a member under Sections 4.05 or 4.06 of these Bylaws, then the following procedure will be followed:

A.    The member will be given 15 days' prior notice, by any method reasonably calculated to provide actual notice, of the proposed expulsion or suspension and the reasons for the proposed expulsion or suspension. Any notice given by mail will be sent by first class, registered, or certified mail to the member's last address as shown on the Corporation's records.
B.    The member will be given an opportunity to be heard, either orally or in writing, at least 30 days before the effective date of the proposed expulsion or suspension. The hearing will be held, or the written statement considered, by the Board or by a committee or person authorized by the Board to determine whether the expulsion or suspension should take place.
C.    The Board, committee, or person will decide whether or not the member should be suspended, expelled or sanctioned in some other way. The decision of the Board, committee or person will be final.
D.    Any action challenging an expulsion, suspension, or termination of membership, including a claim alleging defective notice, must be commenced within one year after the date of the expulsion, suspension,

or termination.

16.   On December 3, 2004 (a Friday afternoon), Defendants McAninch, Watts, Vaaler
organized a special meeting of the Board of the ATA to be held December 6, 2004 (the
following Monday), calling for a vote to support legislation regarding Federal Excise
Taxes from 12% to a flat $.39 per arrow.   Said defendants purposefully scheduled the
meeting to avoid giving meaningful notice to Eastman, who has a Board Seat in Robert
Eastman.   Two other board members also did not receive notice of the special meeting.
Without the presence of Robert Eastman, and other directors, the ATA Board passed a
resolution to support FET changes which were advantageous to Easton, Hoyt, and
Easton-Hoyt, and disadvantageous to Eastman and other ATA members.

17.   In early 2005 (the document is undated), Defendant Erik Watts wrote, published, and
distributed a document titled "How do Companies Cheat, & Other Problems in the
System?"  Said document is attached as Exhibit B.  Said document contains several
"Cases" and first names Eastman as a company who "Cheats."  Said document closes
with the statement that "Publishing the Archery Trade Association FET Guide in 2005
will help to educate the industry and improve compliance."

18.   The ATA FET (Federal Excise Tax) guide proposed changes to the FET which will have
business advantages to Defendants Easton, Hoyt, and Easton-Hoyt.

19.   The ATA FET guide proposed changes to the FET which will have adverse effect to the
business of Eastman, dramatically raising the tax on Eastman's imported products.

20.   The arrow FET in fact was changed, as a direct result of lobbying by the ATA, and
defendants.

21.  In the month of September 2005, President of Eastman, and ATA Board Member, Robert Eastman II, wrote and was published in ArrowTrade magazine a letter to the editor titled "*Apology Due Wood Arrow Manufacturers*". A copy of that article is attached as Exhibit C.

22.  On September 15, 2005, the ATA Board met via telephone conference, and defendants Vaaler, Walk and Watts were present. Neither plaintiff or Robert Eastman was give adequate notice of this Board meeting, which purpose was to demand a retraction of Robert Eastman and/or suspend Eastman's membership in the ATA. The ATA Board did in fact meet and resolve to "support the Executive Board's determination" regarding a retraction of Robert Eastman and/or suspend Eastman's membership in the ATA. The minutes of that meeting are attached as Exhibit D.

23.  On September 16, 2005, the ATA Executive Committee informed and demanded of Robert Eastman by way of an unsigned memorandum, a retraction. The ATA letter and proposed Retraction are attached as Exhibits E and F, respectively.

24.  Said ATA Executive Committee letter purports to serve as Eastman's 15 day notice in accordance with ATA Bylaws, §§ 4.06 and 4.07.

25.  On September 30, 2005, Robert Eastman apologized in part, as attached as Exhibit G.

26.  On October 3, 2005, the ATA suspended the ATA membership of Eastman Outdoors, "effective immediately." Suspension of Membership attached as Exhibit H.

**Count I, Breach of Bylaws/Contract**

27.  Eastman incorporates by reference all preceding paragraphs.

28.  The Bylaws of the ATA allow the ATA to suspend a member:

       a.     On 15 days prior notice.  ATA Bylaws, Sec. 4.07(A).

       b.     After the member has had 30 days "to be heard" before the underline(effective) date of the suspension.  ATA Bylaws, Sec. 4.07(B).

29.    The first date that Eastman and Eastman Outdoors were informed that the ATA executive committee and Board were considering suspension of Eastman's ATA membership was September 16, 2005.  See Exhibit E.

30.    Prior to that date, on September 7, 2005, the only communication from ATA, was an email advising of a conference call on September 15, 2005 regarding ATA Code of Conduct and Eastman.   Defendant Jay Mcaninch had reason to know that Robert Eastman would be unavailable and unreachable by telephone or any other form of communication on the week of the September 15, 2005.  Further, Counsel for Eastman Outdoors, Mike Stone, reminded the ATA Board and Executive Committee of this fact in a letter faxed to the ATA prior the time of the meeting on September 15, 2005, requesting an adjournment of the meeting for one week.  The ATA Board and Executive Committee, which are the defendants, ignored this request.  Mike Stone's letter is attached as Exhibit I.

31.    The ATA Board and Executive Committee, to include all defendants, have at no time provided any detail or specific reason why Eastman's letter in the *ArrowTrade* magazine is "voliative of the ATA's Rules of Conduct and otherwise constitutes conduct which is materially and seriously prejudicial to the ATA's purposes and interests." See Exhibit E. At many times prior to September 15, 2005, Eastman requested from ATA detail regarding the alleged conduct which allegedly violated the ATA's Rules of Conduct.

-6-

32. The defendants failed to follow the ATA bylaws in the process to suspend Eastman from the ATA by failing to give Eastman 30 days to be heard on the allegations of "Eastman's Conduct." See Exhibit D.

33. The suspension of Eastman was in bad faith and for the purpose of damaging Eastman in the marketplace.

34. The Bylaws are a contract among its members and various offices of the ATA.

35. Defendant ATA breached this contract by failing to follow its owns Bylaws in the suspension of Eastman.

36. Defendant's breach of this contract is material.

37. Eastman has been damaged by this breach in the loss of its ATA membership, its relationships with its suppliers, contacts, retailers, vendors, and any other party with whom the ATA is associated.

38. Eastman will further be damaged by its inability to participate in the process to promote and protect the archery industry, to include, but not limited to taxation, youth archery programs, and archery standards review and implementation processes. For example, the ATA, without input from Eastman, decided, with any process, that only aluminum arrows are safe for youth hunters, in effect creating a culture and habit of use of aluminum arrows use over carbon arrows among young hunters.

### Count II. Violation of Federal Antitrust Laws, 15 U.S.C. § 1, et seq.

39. Eastman incorporates by reference all preceding paragraphs.

40. All of the actions taken by the defendants and related above were taken willfully, knowingly, unlawfully, and without just cause or provocation. The defendants intended

-7-

that Eastman should be damaged and lose customers and revenue as a result of their actions. The defendants also intended to prevent or inhibit Eastman from entering into direct competition with the manufacturing defendants Easton and Hoyt.

41. As a result of the defendant's conduct, Eastman has sustained and will continue to sustain damages, including impairment of its business, trade, and goodwill, in amount to be proven at trial.

42. The defendant's conduct constitutes a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Eastman has been will continue to be injured in its business or property by reason of the defendants' conduct. Eastman is thus entitled to recover treble damages under the federal antitrust law, 15 U.S.C. § 15.

43. The defendants' conduct is continuing and threatens to cause future irreparable injury to Eastman. Unless the defendants are enjoined pursuant to the Clayton Act, 15 U.S.C. § 26, Eastman will be irreparably injured in that will be unlawfully inhibited in the conduct of its interstate business, will lose distributors, retailers, and end-user customers of its products, and will be unlawfully deterred from selling direct to end users should it so desire.

44. Eastman has no adequate remedy at law.

### Count III - Tortious Interference With Business Relationships and Prospective Economic Advantage

45. Eastman incorporates by reference all preceding paragraphs.

46. Eastman has existing relationships with distributors, retailers, and end-users of its products, and the defendants are aware of those relationships.

47. The defendants intended, by their conduct, to interfere in those relationships by removing

Eastman's ability to present its products to those products at the ATA's annual trade show, removing ATA membership, and ostensibly, approval, of Eastman's products.

48.    The defendants' conduct is without just cause, is in violation of federal and state antitrust laws, and has caused and will continue to cause damages to Eastman.

49.    The defendants have acted with oppressiveness which was not the result of mistake of fact or law, an honest error of judgment, or mere over-zealousness.  Eastman is thus entitled to recover exemplary damages in addition to compensatory damages.

**Wherefore**, plaintiff Eastman respectfully requests that the Court:

a.    Enter a preliminary injunction, binding on the defendants and any persons combining or acting in concert with them, declaring that the acts of the manufacturing defendants is *per se* illegal pursuant to Section of the Sherman Act, 15 U.S.C. § 1, and enjoining them from engaging in any act to interfere with Eastman's relationships with distributors, retailers, or end users, to include, but not limited to its membership in the ATA and participation in ATA activities;

b.    After a trial of this action, make permanent the injunction described in subsection (a) above; and

c.    Enter judgment in Eastman's favor and against the defendants jointly and severally for treble damages Eastman has sustained as a result of the defendants' unlawful acts, together with costs and attorney fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and pursuant to Michigan Statute.

d.    Enter judgment in Eastman's favor and against the defendants jointly and severally for compensatory damages in an amount to be proven at trial, and for

exemplary damages based on their tortious interference with Eastman's

relationships and economic advantage;

e.     Enter judgment in Eastman's favor for breach of contract of the ATA Bylaws; and

f.     Enter judgment in Eastman's favor for all other just and proper relief.

October 18, 2005                          Respectfully submitted,

                                          Don Darnell (P55268)
                                          Darnell & Lulgjuraj, P.C.
                                          311 Weiser Way
                                          Chelsea, Michigan 48118
                                          734-433-0816

## DEMAND FOR JURY TRIAL

Eastman Outdoors, Inc. demands a jury trial for all issues so triable.

October 18, 2005                          Respectfully submitted,

                                          Don Darnell (P55268)
                                          Darnell & Lulgjuraj, P.C.
                                          311 Weiser Way
                                          Chelsea, Michigan 48118
                                          734-433-0816

A

AS OF DECEMBER 11, 2002

# BY LAWS

# OF

# ARCHERY TRADE ASSOCIATION, INC.

## ARTICLE 1:  NAME

The name of this corporation is Archery Trade Association, Inc. (the "Corporation").

## ARTICLE 2:  OFFICES

Section 2.01.  Principal Executive Office.  The Corporation's principal executive office will be located in Vienna, Virginia.

Section 2.02.  Other Offices.  Other offices may be established at any time and at any place or places specified by the Board of Directors.

## ARTICLE 3:  OBJECTIVES AND PURPOSES

Section 3.01.  Specific Purposes.  The Corporation has been formed as a non-profit business league as described in section 501(c)(6) of the Internal Revenue Code of 1986, as amended (the "Code") to market, promote and serve individuals, companies and corporations involved in the manufacture, wholesale and retail sales and distribution of archery equipment, products, goods and services, as stated in greater detail in the Corporation's Articles of Incorporation.

Section 3.02.  Incidental Purposes.  In addition, the Corporation is formed for the purposes of performing all things incidental to, or appropriate in, the achievement of the Corporation's specific and primary purposes.  However, the Corporation must not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of its specific and primary purposes.

Section 3.03.  Limitations on the Corporation's Purposes.

   A.    The Corporation holds and may exercise all such powers as may be conferred upon a nonstock corporation by the laws of the Commonwealth of Virginia and as may be necessary or expedient for the administration of the Corporation's affairs and attainment of its purposes.  Despite anything in these Bylaws to the contrary, in all events, the Corporation must not engage in activities that are not permitted to be carried on by a corporation exempt under section 501(c)(6) of the Code.

1

B.    The Corporation has been formed under the Virginia Nonstock Corporation Act for non-profit purposes. Its activities will be further limited as provided in the Articles of Incorporation.

## ARTICLE 4: MEMBERSHIP

Section 4.01. Qualifications. An organization that subscribes to the purposes and basic policies of the Corporation and whose admission will contribute to the Corporation's ability to carry out its purposes will be eligible for membership on approval of the membership application by the Board of Directors and on timely payment of such dues and fees as the Board may fix from time to time. The Corporation will have the following classes of members:

Regular Members – Any manufacturing firm, or wholesale distributing firm, corporation or partnership whose primary business is manufacturing and distributing archery equipment shall be eligible upon written application for full membership. Regular Members have the right to vote, as set forth in these Bylaws, on the election of Directors, on the disposition of all or substantially all of the Corporation's assets, on any merger and its principal terms and any amendment of those terms, on any election to dissolve the Corporation, and on amendment of the Corporation's Articles of Incorporation. In addition, Regular Members have all rights afforded members under the Virginia Nonstock Corporation Act of Virginia. Regular Members will pay dues as established by the Board of Directors, and persons affiliated with them ~~are eligible for election to the Board of Directors and~~ may serve on any of the Corporation's Board or Working Committees (except as otherwise provided in these Bylaws).

Supporting Members –Any manufacturing organization whose primary business is non-archery related but supplies components, materials or items to the Corporation's members; trade and consumer magazines whose business is directly connected to archery; manufacturers' representatives or representative organizations involved in the archery industry; and wholesale distributing firms, may make application for a Supporting Membership to the Corporation.  Supporting Membership may be granted upon approval by the Board of Directors, and payment of dues as established by the Corporation's Board of Directors. Supporting Members will not have the right to vote or to have their representatives serve on the Board of Directors or the Corporation's Board or Working Committees.

Retail Members – Retail Membership will be granted upon application and approval by the Board of Directors to archery retail operations. Retail Members will be professional dealers whose purpose is to sell archery and bowhunting equipment, products and services to consumers. Retail Members will pay dues as established by the Corporation's Board of Directors. Retail Membership will be granted without the right to vote as members or to serve on the Board of Directors or the Corporation's Board or Working Committees, except that Retail Members shall have the exclusive right to vote for, and to have persons affiliated with them serve on, the Dealer Council under Section 6.04 and on the Board of Directors as Retail Member Directors as provided in Section 5.02.

*[handwritten margin note:] Complies with Common ownership & may not serve concurrently with over Board members.*

Sales Representative Members - Membership will be granted upon application and approval by the Board of Directors to archery sales representative organizations, groups or other organizations involved in selling archery and bowhunting equipment and products to retail operations. These members will pay dues as established by the Corporation's Board of Directors. Sales Representative membership will be granted without the right to vote as members or to serve on the Board of Directors or the Corporation's Board or Working Committees, except that Sales Representative Members shall have the exclusive right to vote for, and to have persons affiliated with them serve on, the Sales Representative Committee under Section 6.05 and on the Board of Directors as a Sales Representative Member Director as provided in Section 5.02.

Honorary Members –The Board of Directors of the Corporation, from time to time, may select and elect to honorary membership persons who have rendered distinguished service in the archery industry including service and promotion of the sport and service to the Corporation.  Honorary Membership will be granted without rights to vote or to have their representatives serve on the Board of Directors or the Corporation's Board or Working Committees.

Section 4.02. Rights of Membership. The Corporation may benefit, serve, or assist persons who are not members, but may restrict the provision of certain benefits, services, and assistance to members. A corporate member may designate in writing the name or position of the individual entitled to vote or exercise its rights and to receive notices on behalf of the member. The member may amend such designation at any time, and all such designations and amendments to the designation will be filed with the records of this Corporation. No member is entitled to any dividend or any part of the income of the Corporation or to share in the distribution of the corporate assets upon the Corporation's dissolution.

Section 4.03. Other Persons Associated with the Corporation. The Corporation may refer to persons or entities associated with it as "members," even though those person or entities do not meet the qualifications for membership as set forth in Section 4.01 of these Bylaws, but no such reference will constitute anyone a member with the rights of membership.

Section 4.04. Dues, Fees, and Assessments. Each member must pay, within the time and on the conditions set by the Board, the dues, fees, and assessments in amounts to be fixed from time to time by the Board. Those members who have timely paid the required dues, fees, and assessments and who are not suspended will be members in good standing. The Board may require the payment of dues, fees, and assessments, in amounts to be fixed from time to time, by those persons or entities associated with the Corporation as described in Section 4.03 of these Bylaws.

Section 4.05. Termination of Membership. A membership will terminate on occurrence of any of the following events:

 A. Resignation of the member, on reasonable notice to the Corporation;

B.   Expiration of the period of membership, unless the membership is renewed on the renewal terms fixed by the Board;

C.   Failure of the member to pay dues, fees, or assessments as set by the Board within 30 days after they become due and payable;

D.   Occurrence of any event that renders the member ineligible for membership, or failure to satisfy membership qualifications; or

E.   Expulsion of the member under Section 4.07 of these Bylaws based on the good faith determination by the Board, or a committee or person authorized by the Board to make such a determination, that the member has failed in a material and serious degree to observe the rules of conduct of the Corporation, or has engaged in conduct materially and seriously prejudicial to the Corporation's purposes and interests.

Section 4.06. <u>Suspension of Membership</u>. A member may be suspended under Section 4.07 of these Bylaws, based on the good faith determination by the Board, or a committee or person authorized by the Board to make such a determination, that the member has failed in a material and serious degree to observe the Corporation's rules of conduct, or has engaged in conduct materially and seriously prejudicial to the Corporation's purposes and interests. A person whose membership is suspended will not be a member during the period of suspension.

Section 4.07. <u>Procedure for Expulsion or Suspension</u>. If grounds appear to exist for expulsion or suspension of a member under Sections 4.05 or 4.06 of these Bylaws, then the following procedure will be followed:

A.   The member will be given 15 days' prior notice, by any method reasonably calculated to provide actual notice, of the proposed expulsion or suspension and the reasons for the proposed expulsion or suspension. Any notice given by mail will be sent by first-class, registered, or certified mail to the member's last address as shown on the Corporation's records.

B.   The member will be given an opportunity to be heard, either orally or in writing, at least 30 days before the effective date of the proposed expulsion or suspension. The hearing will be held, or the written statement considered, by the Board or by a committee or person authorized by the Board to determine whether the expulsion or suspension should take place.

C.   The Board, committee, or person will decide whether or not the member should be suspended, expelled or sanctioned in some other way. The decision of the Board, committee or person will be final.

D.   Any action challenging an expulsion, suspension, or termination of membership, including a claim alleging defective notice, must be commenced within one year after the date of the expulsion, suspension, or termination.

Section 4.08. Transfer of Membership. No membership or right arising from membership may be transferred. All membership rights cease on the member's dissolution or termination of membership under Section 4.05 of these Bylaws.

Section 4.09. Liability for Debts or Obligations. A member of the Corporation is not, as such, personally liable for the Corporation's debts, liabilities, or obligations.

Section 4.10. Place of Meeting. Meetings of the Regular Members may be held at any place within or outside the Commonwealth of Virginia designated by the Board of Directors. In the absence of any such designation, members' meetings will be held at the Corporation's principal office.

Section 4.11. Regular Meeting. A regular annual meeting of Regular Members will be held at such time each year as the Board of Directors shall determine. The Board of Directors will fix the date and time and notify members as provided in Section 4.13. At this meeting, the 12 Regular Member Directors will be elected by those entitled to vote (if not earlier elected by mail pursuant to Section 4.19) and any other proper business may be transacted.

Section 4.12. Special Meetings. A special meeting of the Regular Members for any lawful purpose may be called at any time by the Board of Directors, the Chair of the Board, the President, or by Regular Members representing 5% or more of the total voting power of the Regular Members. A special meeting called by any person, other than the Board, entitled to call a meeting will be called by written request, specifying the general nature of the business proposed to be transacted, and submitted to the Chair of the Board, the president or the Secretary. The officer receiving the request will cause notice to be given promptly to the members entitled to vote, in accordance with Section 4.13 of these Bylaws, stating that a meeting will be held at a specified time and date fixed by the Board, provided, however, that the meeting date will be at least 30 but no more than 90 days after receipt of the request. If the notice is not given within 20 days after the request is received, then the person or persons requesting the meeting may give the notice. Nothing in this Section 4.12 will be construed as limiting, fixing, or affecting the time at which a meeting of members may be held when the meeting is called by the Board. No business, other than the business the general nature of which was set forth in the notice of the meeting, may be transacted at a special meeting.

Section 4.13. Notice of Meetings.

    A.    Whenever Regular Members are required or permitted to take action at a meeting, a notice of the meeting will be given at least 10, but no more than 60, days before the meeting date to each Regular Member entitled to vote at that meeting, unless different notice is required by law. The notice will be given either personally or by first-class, registered, or certified mail, or by electronic mail, or by facsimile or by other means of written communication, charges prepaid, and will be addressed to each Regular Member entitled to vote at the address of that member appearing on the Corporation's books or at the address given by the member to the Corporation for purposes of notice. If no address appears on the Corporation's

books and no address has been so given, then notice shall be deemed to have been given if either sent in writing to the Corporation's principal office or published at least once in a newspaper of general circulation in the county in which the Corporation's principal office is located. An affidavit of the mailing or other means of giving any notice of any members' meeting may be executed by the Secretary or any other party of the Corporation's giving the notice, and if so executed, will be filed and maintained in the Corporation's minute book.

B.   Notices will specify the place, date, and hour of the meeting and (1) for a special meeting, the general nature of the business to be transacted; or (2) for a regular meeting, those matters which the Board, at the time notice is given, intends to present for action by the Regular Members, but except as provided in Sections 4.12 and 4.14 of these Bylaws, any proper matter may be presented at the meeting. The notice of a meeting at which Directors are to be elected will include the names, biographies and statements of all persons who have consented to be nominees.

C.   Approval by the Regular Members of any of the following proposals, other than by unanimous approval by those entitled to vote, is valid only if the notice or written waiver of notice states the general nature of the proposal or proposals:

1.   removing a Director with or without cause;
2.   amending the Articles of Incorporation;
3.   electing to wind up and dissolve the Corporation;
4.   approving a plan of merger or consolidation; or
5.   disposing of all or substantially all of the Corporation's assets.

Section 4.14. Quorum. Five percent of the voting power of the Regular Members will constitute a quorum for the transaction of business at any meeting of Regular Members provided, however, that if any regular meeting is actually attended in person or by proxy by less than 1/3 of the voting power, then the only matters that may be voted on are those of which notice of their general nature was given under Section 4.13 of these Bylaws. Subject to the foregoing, the Regular Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, in spite of the withdrawal of enough members to leave less than a quorum, if any action taken, other than adjournment, is approved by at least a majority of the members required to constitute a quorum, or such greater number as required by the Corporation's Articles of Incorporation, these Bylaws, or by law.

Section 4.15. Adjournment. Any Regular Members' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Regular Members represented at the meeting, either in person or by proxy. No meeting may be adjourned for more than 45 days. When a Regular Members' meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place to which the meeting is adjourned are announced at the meeting at which adjournment is taken. If after adjournment a new record date is fixed for notice or voting, then a notice of the adjourned meeting will be given to each Regular Member who, on the record date for notice of the meeting, is entitled to vote at

the meeting. At the adjourned meeting, the Corporation may transact any business that might have been transacted at the original meeting.

Section 4.16. <u>Voting</u>. Regular Members entitled to vote at any meeting of members will be those Regular Members in good standing as of the record date determined under Section 4.20 of these Bylaws. Voting may be by voice or ballot, except that any election of those Directors for which the Regular Members may vote pursuant to Section 5.02 must be by ballot if demanded by any Regular Member at the meeting before the voting begins. Each Regular Member entitled to vote will be entitled to cast one vote on each matter submitted to a vote of the members. Cumulative voting is prohibited. If a quorum is present, then the affirmative vote of a majority of the voting power represented at the meeting, entitled to vote and voting on any matter, will be the act of the Regular Members, unless the vote of a greater number or voting by classes is required by law, the Articles of Incorporation, or these Bylaws. In any election of Directors, the candidates receiving the highest number of votes are elected. Each Regular Member will have the right to vote for as many nominees as there are vacancies on the Board of Directors to be filled by the Regular Members pursuant to Section 5.02.

Section 4.17. <u>Waiver of Notice or Consent by Absent Members</u>.

A.    If a quorum is present either in person or by proxy and if, either before or after the meeting, each Regular Member entitled to vote, not present in person or by proxy, signs a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting, then the transactions of any meeting of Regular Members, however called or noticed and whenever held, will be as valid as though taken at a meeting duly held after regular call and notice. The waiver of notice, consent, or approval need not specify either the business to be transacted or the purpose of any meeting of Regular Members, except that if action is taken or proposed to be taken for approval of any of those matters specified in the last paragraph of Section 4.13 of these Bylaws, then the waiver of notice, consent, or approval will state the general nature of the proposal. All such waivers, consents, or approvals will be filed with the corporate records or made a part of the minutes of the meeting.

B.    A Regular Member's attendance at a meeting also will constitute a waiver of notice of and presence at that meeting, <u>unless the member objects at the beginning of the meeting to the transaction of any business because the meeting was not lawfully called or convened</u>. Also, attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the notice of the meeting but not so included, if that objection is expressly made at the meeting.

Section 4.18. <u>Action by Unanimous Written Consent</u>. Any action required or permitted to be taken by the Regular Members may be taken without a meeting and without prior notice, if all Regular Members consent in writing to the action. The written consents will be filed with the minutes of the proceedings of the Regular Members. The action by written consent will have the same force and effect as the unanimous vote of the Regular Members.

Section 4.19. <u>Action By Written Ballot Without a Meeting</u>. The election of Directors may be conducted without a meeting and without prior notice by complying with the provisions of this Section 4.19 concerning written ballots.

The Corporation will distribute one written ballot to each Regular Member entitled to vote on the matter. Such ballots will be mailed or delivered in the manner required by the first paragraph of Section 4.13 of these Bylaws. All solicitations of votes by written ballot will:

    A.    indicate the number of responses needed to meet the quorum requirement;

    B.    specify the time by which the ballot must be received in order to be counted; and

    C.    provide a reasonable time within which to return the ballot to the Corporation.

In any election of Directors, a written ballot that a member marks "withhold" or otherwise marks in a manner indicating that authority to vote is withheld, will not be voted either for or against the election of a Director.

Approval by written ballot will be valid only when the number of votes cast by ballot, including those ballots marked "withhold" or otherwise indicate that authority to vote is withheld, within the time specified equals or exceeds the quorum required to be present at a meeting authorizing the action. A written ballot may not be revoked.

All written ballots will be filed with the Secretary of the Corporation and maintained in the corporate records.

Section 4.20. <u>Record Date</u>. For purposes of determining the Regular Members entitled to notice of any meeting, entitled to vote at any meeting, entitled to vote by written ballot, or entitled to exercise any rights with respect to any lawful action, the Board may, in advance, fix a record date. The record date so fixed will not be more than 70 nor less than 10 days before the date of the meeting, the mailing of the first ballot or other action for which the record date is being established. If not otherwise fixed by the Board of Directors the record date will be the next business day preceding the day on which notice is given or, if notice is waived, the next business day preceding the day on which the meeting is held. A Regular Member at the close of business on the record date will be a Regular Member of record.

Section 4.21. <u>Proxies</u>.

    A.    Each Regular Member entitled to vote has the right to do so either in person or by one or more agents authorized by a written proxy, signed by the member and filed with the Secretary of the Corporation. In any election of Directors, any form of proxy that a member marks "withhold," or otherwise marks in a manner indicating that authority to vote for the election of Directors is withheld, will not be voted either for or against the election of a Director.

B.    A validly executed proxy will continue in full force and effect until revoked by the member executing it, before the vote is cast under that proxy, by a writing delivered to the Corporation stating that the proxy is revoked, by a later proxy executed by that Regular Member and presented to the meeting, or as to any meeting, by that member's personal attendance and voting at the meeting. No proxy will be valid after the expiration of 11 months from the date of the proxy, unless otherwise provided in the proxy.

Section 4.22. Election of Directors.



A.    The Board of Directors or any Regular Member may nominate candidates for Regular Member Directors. In nominating candidates, the Board will seek to achieve diversity of backgrounds and skills relevant to the needs of the Corporation, and such other goals as the Board of Directors may establish.

B.    Nominations will close 60 days before the day Directors are to be elected, or at such other time as the Board of Directors may set. No nominations can be made after this date other than as provided below in Section 4.22(D).

C.    All candidates for the Board of Directors must have consented to stand for election and provided the Secretary with a biography and statement of purpose on or before 60 days before the day Directors are to be elected, or at such other time as the Board of Directors may set.

D.    If after the close of nominations the number of people nominated is not more than the number of Regular Member Directors to be elected, then the Corporation may without further action declare that those nominated and qualified to be elected have been elected.  If after the close of nominations the number of people who have consented to stand for election is more than the number of Regular Member Directors to be elected, then the Secretary will forward to each Regular Member, with the notice of the meeting or vote required by these Bylaws, a list of all such candidates.

E.    If there is a meeting of Regular Members to elect Directors, any Regular Member present at the meeting in person or by proxy may place names in nomination to stand for election as long as the candidate so nominated has consented to stand for election.

F.    The Board will maintain procedures that allow a reasonable opportunity for a nominee to communicate to members the nominee's qualifications and the reasons for the nominee's candidacy, a reasonable opportunity for the nominee to solicit votes, and a reasonable opportunity for all Regular Members to choose among the nominees.

Section 4.23 <u>Application to Retail Members and Sales Representative Members</u>.

Unless either the Retail Members or the Sales Representative Members adopt contrary rules governing their respective meetings and the election of the Dealer Council and the Sales Representative Committee, the appropriate sections of this Article will apply with such changes and substitutions as may be appropriate.

## ARTICLE 5:  BOARD OF DIRECTORS

Section 5.01.  <u>Powers</u>.  Subject to the provisions of the Virginia Nonstock Corporation Act, the Corporation's Board of Directors will manage all of the Corporation's activities and affairs, and the Board of Directors also will exercise and will direct all corporate powers.  The Board of Directors may delegate the management of the day-to-day operation of the Corporation's business to its President and Chief Executive Officer, as well as to the Executive Committee (as provided below), or other person, provided that the Board of Directors will manage all of the Corporation's activities and affairs and that the Board of Directors will have ultimate direction regarding the exercise of all corporate powers.

Section 5.02.  <u>Number of Directors</u>.  The authorized number of Directors of the Corporation will be 12 representatives of the Regular Members (known as "Regular Member Directors"), plus 3 representatives of the Retail Members (consisting of the Chair and two Vice Chairs of the Dealer Council as provided in Section 6.04, known as "Retail Member Directors"), plus either the elected representative of the Sales Representative Members or the Chair of the Sales Representative Committee, as provided in Section 6.05 (know as the "Sales Representative Director").  In addition, the current President of the Corporation and its immediate past-Chair will be ex-officio members of the Board of Directors without voting rights, except that the immediate past-Chair, or in his or her absence, the President, may vote to break a tie.

Section 5.03.  <u>Qualifications of Directors</u>.  It is the intent of the Corporation that the composition of the Board of Directors represent a diversity of technical skills and interests to enable the Board of Directors to make informed, well-balanced decisions on the economic viability and social impact of its activities. Directors must be individuals and, except for the Sales Representative Member and Retail Member Directors, must be affiliated with Regular Members of the Corporation in good standing. ~~No member may have more than one voting Director affiliated with it.~~ Regular members with common ownership with other Regular members may only have one individual serve on the Board of Directors at any on given time.

Section 5.04.  <u>Election and Term of Office</u>.

    A.    The 12 initial Regular Member representatives on the Board of Directors will serve until their successors have been elected and seated at the Corporation's annual meeting. The terms of the Directors shall be staggered, with the Directors classified into three groups, so that approximately one-third of the Board is elected annually.

B.    The term of office of each Director of the Corporation (other than the Sales Representative Member and Retail Member Directors) is 3 years and until a successor has been elected and seated. The terms of the Sales Representative Member and Retail Member Directors will be determined by the Sales Representative Committee and the Dealer Council, respectively.

C.    A Director may succeed himself or herself in office, and there is no limit to the number of consecutive terms that a Director may serve.

**Section 5.05.** <u>Vacancies and Removal</u>.

A.    A vacancy in the Board of Directors will be deemed to exist on the occurrence of any of the following: (1) a Director's death, resignation, or removal; (2) an increase in the authorized number of Directors; or (3) the failure of the Regular Members, after any election at which any Regular Member Director or Directors are elected, to elect the full authorized number of Regular Member Directors.

B.    The Regular Members may remove any Regular Member Director with or without cause at any regular or special meeting called for that purpose. Before a Regular Member Director can be removed, all members must have been notified in writing in the manner set forth in Article 4 of these Bylaws that such action would be considered at the meeting. By way of illustration and not limitation, the Board may remove a Regular Member Director who has missed the last 2 annual meetings of the Board or 3 consecutive Board meetings.

C.    All vacancies may be filled either (i) by appointment by the Regular Member with whom the departing Regular Member Director was affiliated of another affiliated person, subject to ratification by vote of a majority of the Regular Member Directors then in office, whether or not the number of Regular Member Directors then in office is less than a quorum, or by vote of a sole remaining Regular Member Director; or (ii) if the Regular Member does not appoint a replacement or ceases to be a Regular Member, by vote of a majority of the Regular Member Directors then in office, whether or not the number of Regular Member Directors then in office is less than a quorum, or by vote of a sole remaining Regular Member Director. Each Regular Member Director so substituted will hold office for the remainder of the term of the departed Regular Member Director. A vacancy created by an increase in the authorized number of Regular Member Directors shall be filled by vote of a majority of the Regular Member Directors then in office, whether or not the number of Regular Member Directors then in office is less than a quorum, or by vote of a sole remaining Regular Member Director.

D.    Any Director may resign effective upon giving written notice to the Chair of the Board, the President, the Secretary, or the Corporation's Board of Directors, unless the notice specifies a future time for the resignation's effectiveness. If the

resignation is effective at a future time, then the successor Director may be
elected to take office when the resignation becomes effective. No Director may
resign when the Corporation then would be left without a duly elected Director in
charge of its affairs. In addition, a Director will be deemed to have resigned his or
her seat on the date he or she ceases to be affiliated with a Regular Member.

E.   No reduction of the authorized number of Regular Member Directors will have
the effect of removing any Director prior to the expiration of the Director's term
of office.

F.   The Sales Representative Director and the Retail Member Directors may be
removed, and vacancies with respect to their seats filled, according to such
procedures as the Sales Representative Members and the Retail Members,
respectively, shall adopt from time to time. If they do not adopt rules, this Article
will apply with such changes as may be appropriate.

Section 5.06. <u>Place of Meetings; Meetings by Telephone</u>. Regular meetings of the Board of
Directors may be held at any place within or outside the Commonwealth of Virginia that has
been designated from time to time by the Board. In the absence of such designation, regular
meetings will be held at the Corporation's principal, executive office. Special meetings of the
Board of Directors will be held at any place within or outside the Commonwealth of Virginia
that has been designated in the notice of the meeting or, if not stated in the notice, or if there is
no notice, then at the Corporation's principal, executive office. Despite anything to the contrary
in this Section 5.06, a regular or special meeting of the Board of Directors may be held at any
place consented to in writing by all the Board members, either before or after the meeting. If
consents are given, they will be filed with the minutes of the meeting. Any meeting, regular or
special, may be held by conference telephone or similar communications equipment, as long as
all Directors participating in the meeting can hear one another, and all such Directors will be
deemed to be present in person at such meeting.

Section 5.07. <u>Annual Meeting</u>. The Board of Directors will hold a regular annual meeting in
conjunction with the annual meeting of members, for the purpose of installing the Corporation's
officers previously elected and for transacting other business. Notice of the annual meeting will
be given in the manner set forth in Section 5.09 of these Bylaws.

Section 5.08. <u>Other Regular Meetings</u>. Other regular meetings of the Board of Directors will be
held at such times as are fixed by the Board of Directors. Such regular meetings may be held
without notice.

Section 5.09. <u>Special Meetings</u>.

A.   The Chair of the Board, the President, the Secretary, or any two Directors may
call a special meeting of the Board of Directors at any time and for any purpose.

B.   Written notice of the date, time, and place of the special meeting will be delivered
personally to each Director or communicated to each Director by telephone,

facsimile, electronic mail, express mail service, first-class mail, or by other means of written communication, with charges prepaid, addressed to the Director at his or her address as it appears upon the Corporation's records or if it is not so shown on such records or is not readily ascertainable, then at the place at which meetings of the Directors regularly are held. If the notice is mailed, then it will be deposited in the United States mail at least 10 days prior to the time of the holding of the meeting. If the notice is delivered personally or by telephone, facsimile, or electronic mail, then it will be so delivered at least 5 days prior to the time of the holding of the meeting. The notice need not specify the meeting's purpose.

C.     Notice of a meeting need not be given to any Director who signs a waiver of notice, a consent to holding the meeting, an approval of the minutes of the meeting, whether before or after the meeting, or who attends the meeting without protesting, prior to the meeting or at its commencement, the lack of notice to such Director. The waiver of notice or consent need not specify the meeting's purpose. All such waivers, consents, or approvals will be filed with the corporate records or made a part of the minutes of the meeting.

Section 5.10.  Action at a Meeting; Quorum and Required Vote.  Presence of a majority of the Directors then in office at a meeting of the Board of Directors constitutes a quorum for the transaction of business, except as otherwise provided in these Bylaws. Every act done or decision made by a majority of the Directors present at a meeting duly held at which a quorum is present will be regarded as the act of the Board of Directors, unless a greater number, or the same number after disqualifying one or more Directors from voting, is required by the Corporation's Articles of Incorporation, these Bylaws, or by law. Directors may not vote by proxy. A meeting at which a quorum initially is present, including an adjourned meeting, may continue to transact business in spite of the withdrawal of Directors, if any action taken is approved by at least a disinterested majority of the required quorum for such meeting, or such greater number as required by the Corporation's Articles of Incorporation, these Bylaws or by law. The approval of 2/3 of the authorized number of the Corporation's Directors is required for any of the following:  (1) adoption or revocation of a plan of merger or consolidation; (2) a vote regarding the Corporation's voluntary dissolution, bankruptcy or other reorganization;  (3) a vote regarding the sale, lease, or exchange of all or substantially all of the Corporation's property and assets otherwise than in the usual and regular course of its business; or (4) the amendment of the Articles of Incorporation.

Section 5.11.  Adjourned Meeting and Notice.  A majority of the Directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.  If the meeting is adjourned for more than 24 hours, then notice of any adjournment to another time or place will be given prior to the time of the adjourned meeting to the Directors who were not present at the time of the adjournment.  The notice may be waived in the manner provided for in Section 5.09 of these Bylaws.

Section 5.12.  Action Without a Meeting.  Any action either required or permitted to be taken by the Board of Directors may be taken without a meeting, if all members of the Board either individually or collectively consent in writing to such action.  Such written consents will be filed

with the minutes of the proceedings of the Board of Directors. Action by written consent will have the same effect as the unanimous vote of the Directors.

Section 5.13. Fees and Compensation. Directors and members of committees may not receive any compensation for their services as such, but may receive reasonable reimbursement for expenses as may be fixed or determined by resolution of the Board of Directors.

## ARTICLE 6: COMMITTEES

Section 6.01. Board Committees. The Board shall have an Executive Committee, a Nominating Committee, and a Personnel Committee. In addition, the Board of Directors, by resolution adopted by a majority of the Directors then in office may designate one or more such other Board Committees, each of which will consist of 3 or more Directors, to serve at the Board's pleasure. The Board of Directors may designate one or more alternate members of any committee, who may replace any absent member at any committee meeting. The appointment of members or alternate members of a committee requires a majority vote of the Directors then in office. Any such committee, to the extent of the powers specifically delegated in the Board of Directors' resolution or in these Bylaws, may have all or a portion of the authority of the Board of Directors, except that no committee, regardless of Board resolution, may do any of the following:

A.    Approve any action that, under the Virginia Nonstock Corporation Act, also requires the affirmative vote of the members;

B.    Fill vacancies on the Board of Directors or on any committee;

C.    Fix the Directors' compensation for serving on the Board or on any committee;

D.    Amend or repeal the Corporation's Articles of Incorporation or Bylaws or adopt new bylaws;

E.    Amend or repeal any resolution of the Board of Directors that by the resolution's express terms is not so amendable or repealable;

F.    Appoint any other committees of the Board of Directors or the members of such committees;

G.    Approve a plan of merger; consolidation; voluntary dissolution; bankruptcy or reorganization; or for the sale, lease, or exchange of all or substantially all of the Corporation's property and assets otherwise than in the usual regular course of its business; or revoke any such plan; or

H.    Approve any conflict of interests transaction.

No Board Committee may bind the Corporation in a contract or agreement or expend corporate funds, unless authorized to do so by the Board of Directors.

Section 6.02.  Meetings and Actions of Board Committees.  Except to the extent the Retail Members and the Sales Representative Members each adopt different rules governing the operations of the Sales Representative Committee and the Dealer Council, respectively, meetings and actions of all Board Committees will be governed by, and held and taken in accordance with, Article 5 of these Bylaws, concerning meetings and actions of Directors, with such changes in the context of those Bylaws as are necessary to substitute the committee and its members for the Board of Directors and its members, except that the time for regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee. Special meetings of committees also may be called by resolution of the Board of Directors. Notice of special meetings of committees also will be given to any and all alternate members, who have the right to attend all committee meetings.  Minutes will be kept of each meeting of any committee and will be filed with the Corporation's records.  The Board of Directors may adopt rules not inconsistent with these Bylaws for the government of any committee.

Section 6.03.  Executive Committee.  The Executive Committee will be composed of the Chair and the Vice-Chairs. The President will serve as an ex-officio member of this committee. The Executive Committee, unless limited in a resolution of the Board of Directors, will have and may exercise all of the Board's authority in the management of the Corporation's business and affairs between meetings of the Board, including exercising the fiduciary and financial powers and duties of the Board; provided, however, that the Executive Committee must not have the authority of the Board regarding those matters enumerated in Section 6.01. The Corporation's President will send to each Director a summary report of the business conducted at any meeting of the Executive Committee.

Section 6.04  Dealer Council.

    A.    The Dealer Council's mission is to represent and advance the mutual interests of the Retail Members in harmony with those of the other members of the Corporation and the best interests of the archery and bowhunting industry in a way designed to advance the overall mission of the Corporation and its members.

    B.    The Dealer Council will consist of 11 representatives of the Corporation's Retail Members elected exclusively by the Retail Members. The Dealer Council will elect from among Dealer Council members a Chair, who shall chair the Dealer Council, and 2 Vice-Chairs. As provided above in Section 5.02 the Chair and 2 Vice-Chairs of the Dealer Council will serve on the Board of Directors. The Retail Members may adopt rules for the Dealer Council's governance.

Section 6.05  Working Committees. The Corporation may create and use other bodies that it may refer to as "committees" for the purpose of recommending action and other purposes, but unless they qualify as Board Committees under this Article, such committees shall not constitute Board Committees nor exercise any powers of the Board. Such committees may have one or more members that are not Directors, but in all events such committees will report to the Board of Directors. Subject to annual review and continuation by the Board, the initial such committee will be the:

Sales Representative Committee. The Sales Representative Committee will consist of 5 representatives of the Corporation's Sales Representative Members elected exclusively by the Sales Representative Members. The Sales Representative Committee will elect from among Sales Representative Committee members a Chair who will chair the Committee. As provided in Section 5.02, either this Chair or a representative elected by the Sales Representative Members will serve on the Board of Directors. The Sales Representative Members may adopt rules for the Sales Representative Committee's governance.

## ARTICLE 7:  OFFICERS

Section 7.01.  Officers.

A.   The officers of the Corporation consist of the Chair of the Board, 2 or more Vice Chairs of the Board, the President, and the Secretary.  The Board of Directors will elect the officers.  The Chair and Vice-Chairs must be Directors; the other officers need not be Directors. The same person may hold any two or more offices. Unless otherwise expressly provided by the Board, the President shall also serve as the Secretary. The Board of Directors may appoint, and may empower the Chair of the Board or any Vice-Chair to appoint such other officers as the Corporation's activities may require, each of whom will have such authority and perform such duties as are provided in these Bylaws or as the Board of Directors may from time to time determine.

B.   All of the Corporation's officers will hold office from the date elected to the date of the next succeeding annual meeting of the Board of Directors, and until the successors to the officers are elected and qualified; provided that all officers, as well as any other employee or agent of the Corporation, subject to any claim for breach of contract based on any contractual arrangements between any the person and the Corporation, may be removed at any time at the pleasure of the Board of Directors, or, except in the case of an officer chosen by the Board of Directors, by any officer upon whom the power of removal may be conferred by the Board of Directors, and upon the removal, resignation, death, or incapacity of any officer, the Board of Directors, the Chair of the Board, any Vice-Chair, the President or another officer in cases where the Chair of the Board, any Vice-Chair, the President or the other officer has been vested by the Board of Directors with power to appoint, may declare such office vacant and fill such vacancy.

C.   Any officer may resign at any time by giving written notice to the Board of Directors, the Chair of the Board, any Vice-Chair, the President, or the Secretary, without prejudice, however, to the Corporation's rights, if any, under any contract to which the officer is a party.  Any resignation will take effect on the date of the receipt of the notice or at any later time specified in the resignation.  Unless

otherwise specified in the resignation, the acceptance of the resignation will not be necessary to make it effective.

D.     The Board of Directors either by resolution or some other manner will fix, from time to time, the officers' salary and other compensation.

E.     In addition to the duties specified in this Article 7, the Corporation's officers will perform all other duties customarily incident to their office and such other duties as may be required by law, by the Corporation's Articles of Incorporation, or by these Bylaws, subject to the Board of Directors' control, and also will perform such additional duties as the Board of Directors from time to time may assign.

Section 7.02.  Duties of the Chair of the Board.  The Chair of the Board, when present, will preside at all meetings of the Board of Directors and the Executive Committee.  The Chair of the Board, in consultation with the Executive Committee, shall generally exercise oversight over the President, and has authority to execute in the Corporation's name all bonds, contracts, deeds, leases, and other written instruments authorized either generally or specifically by the Board to be executed by the Corporation (except when by law the President's signature is required).

Section 7.03.  Duties of the Vice-Chairs of the Board.  The Vice-Chairs of the Board possesses the powers and will discharge the duties of the Chair in the event of his or her absence, disability, or refusal to act, will have such other duties as the Board may assign from time to time, and will also serve on the Executive Committee.

Section 7.04.  Duties of the President.  The President will function as the Corporation's general manager and chief executive officer, and will manage the Corporation in administering the conduct of its business.  Where appropriate, the Board of Directors will place the President under a contract of employment.  The President is responsible to and is governed by the Board of Directors, will report to and will advise the Board on all significant matters of the Corporation's business, and will see that all orders and resolutions of the Board are carried into effect.  The President is empowered to act, speak for, or otherwise represent the Corporation between meetings of the Board within the boundaries of policies and purposes established by the Board and as set forth in the Corporation's Articles of Incorporation and Bylaws.  The President is responsible for the hiring and firing of all personnel, and is responsible for keeping the Board informed at all times of staff performance as related to program objectives, and for implementing any personnel policies adopted by the Board.  The President is authorized to contract, receive, deposit, disburse, and account for the Corporation's funds in fulfillment of the Corporation's objectives; to execute in the Corporation's name all bonds, contracts, deeds, leases, and other written instruments authorized either generally or specifically by the Board to be executed by the Corporation; and to negotiate all of the Corporation's material business transactions.  The President will also serve as an ex-officio member of all Board and Working Committees and of the Board of Directors and will, in the case of tied votes at any such meeting, cast a vote to break the tie except to the extent the immediate past-Chair is given that power at Board meetings in Section 5.02.

Section 7.05. <u>Duties of the Secretary and Assistant Secretaries</u>.

    A.    The Secretary will record or cause to be recorded, and will keep or cause to be kept, at the principal executive office and such other place as the Board of Directors may order, a book of minutes of actions taken at all meetings of Directors and committees, with the time and place of holding, whether regular or special, and, if special, how authorized, the notice given, the names of those present at such meetings, and the proceedings of such meetings.

    B.    The Secretary will give, or cause to be given, notice of all the meetings of the Board of Directors and of the committees of this Corporation required by these Bylaws or by law to be given. The Secretary will keep the Corporation's seal (if any) in safe custody, and will see that it is affixed to all documents the execution of which on the Corporation's behalf under its seal is duly authorized in accordance with these Bylaws.

*(handwritten margin note: "By-law change")*

## ARTICLE 8:  STANDARD OF CARE

Section 8.01. <u>General</u>.

    A.    A Director must perform the duties of a Director, including duties as a member of any committee of the Board of Directors on which the Director may serve, in good faith, in a manner ~~the Director believes to be~~ in the Corporation's best interest and with such care, including reasonable inquiry, as an ordinarily prudent person in a like situation would use under similar circumstances.

*(handwritten margin note: "that is")*

*(handwritten margin note: "Motion")*

    B.    In performing the duties of a Director, a Director will be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by the following:

        1.    One or more officers or employees of the Corporation whom the Director believes to be reliable and competent in the matters presented;

        2.    Legal counsel, independent accountants, or other persons as to matters that the Director believes to be within such person's professional or expert competence; or

        3.    A committee of the Board upon which the Director does not serve, as to matters within the committee's designated authority, which committee the Director believes to merit confidence, so long as in any such case, the Director acts in good faith, after reasonable inquiry when the need for inquiry is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

C.   Except as provided in Section 8.03 of these Bylaws, a person who performs the duties of a Director in accordance with this Section 8.01 will have no liability based upon any failure or alleged failure to discharge that person's obligations as a Director, including, without limiting the generality of this Subsection 8.01(C), any actions or omissions that exceed or defeat a public or charitable purpose to which a corporation, or assets held by it, are dedicated.

Section 8.02.  Loans.  This Corporation must not make any loan of money or property to, or guarantee the obligation of, any Director or officer; provided, however, that this Corporation may advance money to a Director or to an officer of this Corporation or any subsidiary for expenses reasonably anticipated to be incurred in performance of the duties of such officer or Director so long as the individual would be entitled to be reimbursed for such expenses absent that advance.

Section 8.03.  Director Conflicts of Interests.

A.   A conflict of interests' transaction is a transaction with the Corporation in which a Director of the Corporation has a direct or indirect personal interest.  A conflict of interests transaction is not voidable by the Corporation solely because of the Director's interest in the transaction if any of the following is true:

1.   The material facts of the transaction and the Director's interest were disclosed or known to the Board of Directors or a committee of the Board of Directors and the Board or the committee authorized, approved, or ratified the transaction; or

2.   The transaction was fair to the Corporation.

B.   For purposes of this Section 8.03, a Director of the Corporation has an indirect personal interest in a transaction if (1) another entity in which he or she has a material, financial interest or in which he or she is a general partner is a party to the transaction or (2) another entity of which he or she is a Director, officer, or trustee is a party to the transaction and the transaction is or should be considered by the Corporation's Board of Directors.  A vote or consent of an entity in which the Director has an interest described in the preceding sentence is deemed to be a vote or consent of the Director for purposes of this Section.

C.   For purposes of Subsection 8.03(A)(1) of these Bylaws, a conflict of interests transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the Directors on the Board of Directors, or on the committee, who have no direct or indirect personal interest in the transaction, but a transaction may not be authorized, approved, or ratified under this Section by a single Director.  The approval must be supported, when feasible, by obtaining competitive bids or other evidence that the transaction is no less beneficial to the Corporation than it could have obtained under the circumstances from an unrelated third party. If a majority of the Directors who have no direct or indirect

personal interest in the transaction vote to authorize, approve, or ratify the transaction, then a quorum is present for the purpose of taking action under this Section. The presence of, or a vote cast by, a Director with a direct or indirect personal interest in the transaction does not affect the validity of any action taken under Subsection 8.03(A)(1) if the transaction otherwise is authorized, approved, or ratified as provided in Subsection 8.03(A).

## ARTICLE 9: EXECUTION OF CORPORATE INSTRUMENTS, AND VOTING OF STOCKS AND MEMBERSHIPS HELD BY THE CORPORATION

Section 9.01. Execution of Corporate Instruments.

A. The Board of Directors, in its discretion, may determine the method and designate the signatory officer or officers or other person or persons, to execute any corporate instrument or document, or to sign the corporate name without limitation, except when otherwise provided by law, and such execution or signature will be binding upon the Corporation.

B. Unless otherwise specifically determined by the Board of Directors or otherwise required by law, formal contracts of the Corporation, promissory notes, deeds of trust, mortgages, and other evidences of indebtedness of the Corporation, and other corporate instruments or documents, and certificates of shares of stock owned by the Corporation, will be executed, signed, or endorsed by the Chair of the Board, any Vice-Chair of the Board or the President.

C. The Board of Directors will authorize the person or persons who are to sign all checks and drafts drawn on banks or other depositories on funds to the Corporation's credit or in the Corporation's special accounts.

Section 9.02. Voting of Stocks Owned by Corporation. All stock of other corporations or memberships in other corporations owned or held by the Corporation for itself, or for other parties in any capacity, will be voted, and all proxies with respect to such stock or memberships will be executed, by the person authorized to do so by resolution of the Board of Directors, or in the absence of such authorization, by the Chair of the Board, any Vice-Chair of the Board, the President, or by any other person authorized to do so by the Chair of the Board or the President.

## ARTICLE 10: ANNUAL REPORT

The Corporation will provide to the members and the Directors at their respective annual meetings or via mail or other delivery method, a report containing, among other things, the following information in appropriate detail:

A. The assets and liabilities of the Corporation as of the end of the fiscal year;

B. The principal changes in assets and liabilities during the fiscal year;

C.      The Corporation's revenue or receipts, both unrestricted and restricted to particular purposes, for the fiscal year; and

D.      The Corporation's expenses or disbursements, for both general and restricted purposes, during the fiscal year.

The pertinent report of the Corporation's independent accountants, if any, will accompany the report.  If there is no accountant report, then the certificate of an authorized Corporation officer that such statements were prepared without audit from the Corporation's books and records.

## ARTICLE 11:  MAINTENANCE AND INSPECTION OF CORPORATE RECORDS

Section 11.01.  Maintenance and Inspection of Articles and Bylaws.  The Corporation will keep at its principal office in this State the original or a copy of its Articles of Incorporation and Bylaws, as amended to date, which will be open to inspection by the Directors at all reasonable times during office hours.

Section 11.02.  Maintenance and Inspection of Other Corporate Records.

A.      The accounting books, records, and minutes of proceedings of the Board of Directors and any committees of the Corporation will be kept at such place or places designated by the Board of Directors, or, in the absence of such designation, at the Corporation's principal executive office.  The minutes will be kept in written or typed form, and the accounting books and records will be kept either in written or typed form or in any other form capable of being converted into written, typed, or printed form.  Upon leaving office, each officer, employee, or agent of the Corporation must turn over to the successor or the Chair of the Board or President, in good order, such corporate monies, books, records, minutes, lists, documents, contracts or other property of the Corporation as have been in the custody of the officer, employee, or agent during his or her term of office.

B.      Every Director has the absolute right at any reasonable time to inspect all books, records, and documents of every kind and the Corporation's physical properties and each of its subsidiary corporations.  The inspection may be made in person or by an agent or attorney, and includes the right to copy and make extracts of documents. Members shall have such rights to inspect the records of the Corporation as are provided by law.

## ARTICLE 12:  FISCAL YEAR

The Corporation's fiscal year will end on December 31.

## ARTICLE 13: CONSTRUCTION AND DEFINITIONS

Unless the context requires otherwise, the general provisions, rules of construction, and definitions contained in the Virginia Nonstock Corporation Act, as amended from time to time will govern the construction of these Bylaws. The masculine gender includes the feminine and the neuter, the singular number includes the plural and the plural number includes the singular. The term "person" includes a corporation as well as a natural person. If any competent court of law later deems any portion of these Bylaws invalid or inoperative, then so far as is reasonable and possible (i) the remainder of these Bylaws will be considered valid and operative, and (ii) effect will be given to the intent manifested by the portion deemed invalid or inoperative.

## ARTICLE 14: CORPORATE SEAL

The Corporation's seal will be circular in form and will bear the Corporation's name and words and figures showing that the Corporation was formed in the Commonwealth of Virginia in the year 2002.

## ARTICLE 15: AMENDMENTS

The vote of a majority of the Directors then in office, present at a meeting duly held at which a quorum is present, or through written consent in lieu of a meeting, is required to adopt, amend, or repeal these Bylaws. Such action is authorized only by such written consent or at a duly called and held meeting of the Board of Directors for which written notice of the meeting, setting forth the proposed Bylaw revisions with explanations for the revisions, is given in accordance with these Bylaws, unless such notice is waived in accordance with these Bylaws.

## CERTIFICATE OF PRESIDENT/SECRETARY

I, the undersigned, certify that I am the currently appointed and acting President/Secretary of Archery Trade Association, Inc., and the above Bylaws, consisting of 22 pages, are the Bylaws of this Corporation as adopted by the Incorporator on December 11, 2002, and that they have not been amended or modified since that date.

Dated: December 12, 2002        _____
                                President/Secretary

N:\DATA\client\41483\00003\Bylaws Archery Trade Association, Inc. (va) FINAL.doo

22

B

# How Do Companies Cheat, & Other Problems In the System?

The following case studies are based on FET questions received from archery industry manufacturers, general industry discussions on 'how to calculate' the proper excise tax liability, and knowledge within the industry of many common problems with FET calculation. It is logical to assume these same issues occur within the fishing tackle industry.

**Case #1:** A Domestic Company buys their products through an unrelated Trading Company who pays the Federal Excise Tax as the Importer on the lower sales value from the Trading Company to the Domestic Company. This arrangement is just starting to emerge in archery. It can reduce the FET liability of a Domestic Company by 50%.

> **Situation:** Gametracker Inc. (located in Michigan) had a long history of importing taxable and non-taxable Gametracker branded archery products that Gametracker sold to domestic dealers, distributors, and box stores. Gametracker paid the FET on the taxable products in Michigan until 2000. In 2001 Gametracker restructured their business and adopted the name of Eastman Outdoors (Eastman) under which they continued to sell the same products to the archery dealers, distributors, and box stores. Also in 2001, Eastman retained Pacific Products (Pacific, a Trading Company located in California) to import the Eastman products, and calculate the FET obligation on the value of Pacific's sale of these products to Eastman.

1. Eastman owns the brand name of all products imported on their behalf by Pacific.
   a. The Eastman brand names are put on the products and the packaging materials by the foreign fabricator before the products are shipped to Pacific for sale to Eastman and distribution in the US.
2. Eastman manages the distribution, marketing, and sales of their products and controls the amount of product to be manufactured by their foreign fabricator.
   a. Eastman incurs all of the selling, promotion, and distribution expenses for their branded products.
3. Some of the Eastman products are manufactured under patents. Eastman owns the patents, and enforces their proprietary rights under the patents on other domestic manufacturers through threats and litigation.
4. Pacific only sells the Eastman branded products to Eastman. Pacific does not sell the Eastman products to any other customers.
   a. Pacific may be importing and selling similar products, purchased from the same fabricator, but with other brand names to other companies.
   b. Pacific may import non-branded products, apply individual brand names to the products and packaging, and sell these similar products to other domestic distribution companies. Pacific is probably the Importer of the non-brand specific products they sell.
5. Eastman sells 'special make-up' products that are very similar to the Eastman branded products to big box customers but with the big box brand name on the

product when it is fabricated offshore. These products may be delivered from the foreign manufacturer directly to the box store in a container shipment.

**Relevant Tax Rulings:**

- Where a corporation owns patents under which a taxable article is fabricated by another company for it, the corporation owning the patent is the manufacturer. (Rev. Rul 58-134)
- Where a company not only owns the patents under which a taxable article is fabricated by another company, but also exercises control as to the amounts to be fabricated and exclusive rights to the output, and where the fabricator is not free to sell elsewhere, the company owning the patents is considered to be the manufacturer. (Charles Peckat Mfg. Co.) The logic of the control and exclusive rights in the Peckat ruling should also apply to determine who the Importer is.
- In determining who is an importer for purposes of the manufacturers excise taxes, consideration must be given to the substance of the transaction. The fact that Pacific maintains no inventories, and Eastman determines how much product will be imported suggests that Eastman controls the importation and should be the Importer. (Rev Rul 61-179, 1961-2 CB 183)
- Eastman has the knowledge of the archery market needed to develop products, and Eastman takes the financial risk to design, manufacture, introduce and promote new products, and distribute the products to dealers, distributors, and box stores. Eastman meets all of these key criteria established to be the Importer. (Sony Corporation of America v. United States)
- Pacific does not perform promotional activities for the Eastman products, bear the usual risks, or perform other sales and distribution functions other than as a conduit to import the Eastman products. Eastman appears to be the Importer. (Corex Corporation v. United States)
- Eastman has complete control over the production and marketing of the Eastman Outdoors branded products, since these products are manufactured with the use of Eastman's design patents and carry its trademark. Even though Pacific may import products similar to the Eastman products, only Eastman can sell Eastman Outdoor products and unless Eastman places an order for them they could not be imported into and sold in the United States. Therefore, Eastman is the inducing and efficient cause of Eastman Outdoors products being brought into the United States. (Private Letter Ruling 8125006 appears to have properly addressed this issue.)

**Companies with similar situations:**

Escalade (Bear Archery) is a major importer of non-archery products, and with their acquisition of Bear Archery in 2003 they are now a major importer of archery equipment. PSE is primarily a domestic bow manufacturer and archery products distributor, but they are also importing arrows from China and a low cost bow from Taiwan.

**How to close the hole and properly classify the importer:**
The key issue is simple when a 'substance over form' analysis is used to determine, "Who is the Importer".

- When the foreign assembler of an imported product 1) puts a specific brand name on the product, 2) hence the product can only be sold to an exclusive sales and distribution company, 3) the sales and distribution company incurs the financial risk and costs for promotion, sales, and distribution of the products, and who controls the brand name in the market should therefore be the Importer.

- Focusing on the 'substance' of the transaction can close the loophole used by domestic sales and distribution companies who set up a trading company to import their archery, fishing tackle, guns, and ammunition products to reduce their FET obligations.

- **The interpretation under PLR 8125006 has not been consistently followed by the IRS to determine 'who is the importer', though it appears to properly classify the importer responsible for the tax. Does the IRC and the relevant technical rulings support this interpretation or will it require Congressional action to clarify who is the importer?**

**Case #2:** A Manufacturer sells similar or identical products on an OEM basis under different brand names to Sales & Distribution Companies, and then decides to sell very similar items directly to retailers.

1. If the Sales & Distribution Companies do not do any further manufacturing, the Manufacturer is liable for and pays the FET on his sales to the Sales & Distribution Companies.

2. When the Manufacturer sells the same products under his own brand name to retailers or distributors he pays the FET on his constructive sales price to the retailers or distributors, and the FET is typically calculated on this higher selling price than on his sales value to the Sales & Distribution Companies who sell identical products to the retailers or distributors.

   - These circumstances appear to create a higher FET burden on the identical products that are sold under the Manufacturer's brand name than the same products sold under the Sales & Distribution Company brand names.
     
     i. This puts the Manufacturer who decides to sell the identical products directly to retailers at a disadvantage to his customers who buy identical products that they sell under their own brand name.

   - A related issue occurs when a Sales & Distribution Company, who has paid the FET in the past on their branded product sales to retailers or distributors, asks their Manufacturing supplier to 'pay the FET' on the sales value from the Manufacturer to the Sales & Distribution Company, to reduce the selling value on which the FET is calculated.

This is a common problem among the archery accessory manufacturers of sights, stabilizers, limb savers, rests, and arrow components.

**Case #3:** A Corporation with integrated manufacturing, sales, and distribution of their products, separates their bow Manufacturing Company from their Sales and Distribution Company. After separation, the Manufacturing Company sells bow components as well as fully assembled bows to unrelated Sales and Distribution Companies to establish the 'business purpose' of the separate Manufacturing Company, but also sells bows to their own Separate Sales & Distribution Company. (This appears to be the situation with two bow manufacturers, Martin Archery and High Country Archery/Archery Pro LLC). The relationship between the Manufacturing and the related Sales and Distribution Company is disguised, without any common ownership.

1. Some, but not all, bows produced by the Manufacturing Company are covered by patents. The actual ownership of the patents is not known, but the market is told the Sales & Distribution Company owns the patents.
2. The separate Manufacturing Company calculates the FET on their sales at the manufacturing level to the Sales & Distribution Company. FET calculated at the Manufacturing Company level is significantly less than the tax due at the Sales & Distribution Company level.

Companies that manufacture and sell their own branded products to retailers and distributors are at a significant cost disadvantage when a competitor structures their business to have their suppliers pay the FET.

**Case #4:** Broadheads are typically sold as a packaged product with from one to six broadheads in a box, clamshell, or a blister pack. Some companies assemble the components of the broadhead (point, ferrule, and blade) before the broadheads are packaged, and other companies put the individual components in the package and the assembly is completed by the final consumer. Replacement blades are packaged and sold separately.

1. Two broadhead companies both sell a package with unassembled broadhead components needed to assemble three broadheads.
   a. One company (Muzzy) has been advised to pay FET on their sales value to the retailer or distributor.
   b. The second company (NAP) was told they were merely packaging broadhead components and not doing any further manufacturing, and the FET should be paid by the broadhead component manufacturer. NAP received a significant FET refund based on this audit advice to move the calculation of the FET to the component manufacturing level, and continues to understate their FET obligation.

The different advice received by two companies with nearly identical manufacturing operations and products allows one to reduce their FET obligation by more than 50%.

**Case #5:** Accessory companies rely on the 'Bows and Arrows- Taxable vs. Nontaxable' listing to determine if their product is subject to FET. Though the 11% tax on bows is also imposed on the sale of any part or accessory suitable for inclusion in or attachment to a taxable bow, if the accessory is not specifically shown on the listing, the accessory company is told, or assumes, their product is not taxable.

- Broadhead replacement blades are not listed on the IRS listing of 'Bows and Arrows- Taxable vs. Nontaxable' items. This is illogical and creates confusion in the market.

- An update of the 'taxable products' listing that reflects the current archery products in the market that are taxable or non-taxable must be published and maintained. This may need a coordinated effort between the ATA and the IRS.

**Case #6:** Bow accessories are sold to bow manufacturers that resell these accessories to retailers (sights, quivers, limb savers, peeps, stabilizers). The accessory items are sold 1) as individual items, 2) in a package as a 'bow kit', 3) assembled on the bow, or 4) sold in the bow box to be put on the bow by the retailer.

1. The FET obligation is paid by the accessory manufacturer and the bow manufacturer assumes he does not do any further manufacturing to the accessory items.
2. The accessory manufacturer sells the same items to retailers and distributors at a higher price than the OEM price to the bow manufacturer.
3. If the bow manufacturer attaches the accessory items on a bow before it is sold to the retailer or distributor, is this 'further manufacturing'? Should the FET be calculated on the sales value of the bow with assembled accessories, with the bow manufacturer taking a credit for the FET already paid to the accessory manufacturer?

**Case #7:** Bow and crossbow companies purchase all of the components of their product from independent suppliers, assemble these purchased components into bows or crossbows, and assume they are not doing any manufacturing (merely assembling components).

1. Suppliers pay the FET on the value of the component parts sold to the assembler.

This treatment does not appear to be correct, but the crossbow companies are convinced 'they have been audited' and are doing everything correctly.

**Case #8:** Companies that manufacture or import taxable products are not aware of, or chose to ignore, their FET obligation. They are willing to play the 'audit lottery' and assume the IRS will not identify their business for an FET examination. There is significant dialogue among manufacturers and importers when one company identifies

how to reduce their excise tax obligations. This information travels throughout the industry, and all compliance moves to the lowest possible excise tax calculation that can be supported (even though the support may be incorrect).

1. Coordinating industry sources and information (to identify major companies, whether they import or manufacture domestically, etc), with IRS knowledge of returns filed and the tax collected, may be the most efficient method to identify the companies that are not filing properly.

2. The TTB auditors believe the FFL license that is required to manufacture or sell guns and ammunition dramatically improves and simplifies compliance by providing them with a master listing of all potential taxpayers.

3. GoldTip grew to be the second largest domestic arrow/shaft manufacturer without paying FET. This was not identified until industry information and the FET by State information was compared for 1996-2001.

4. Archery excise tax collections by state have been published since 1980. Can this information continue to be shared with industry to help identify and correct these problems?

5. If the inconsistency cannot be solved with a coordinated effort, all companies will be forced to follow those with the most aggressive stance in calculating their excise tax obligation because of competitive pressure.

Publishing the Archery Trade Association FET Guide in 2005 will help to educate the industry and improve compliance.

C

# r ArrowTrade...

## ssbow Specialist Reviews Coverage

a short note to share a cou-
omments with you. I just
d your latest issue of
ade. My first comment is
is nice to see one of the
ry Magazines" that has not
away from the issue of the
w under these quaking polit-
ie . The other two big-boys
have omitted anything to do
e crossbow. No crossbows, no
ow accessories, no nothing
archery's current rage. You, on
her hand, remain true to your
al beliefs. I tip my hat to you
ur integrity.

he second point I would like to
up is your fine editorial in the
issue. It is an eye-opener for
that so badly misunderstand
a crossbow really is.
tunately, it is not just the grass-
archer that has been ingrained
misconceptions about this
on from a deceitful and unin-
ed camp, it is the dealers. You
taken an excellent step in the
ation of this segment of our
stry. If our dealers become
med, they will be better able to
m the consumer. It is a no-
her to even the simplest of
kers.

The final point I would applaud
on is the need for more cross-
competitions to keep the off-
ion shooter active in the sport.
IBO and NFAA now have cross-
classes, but I still hear tales of
cold-shoulder treatment and
n verbal abuse from vertical
hers, when a shooter shows up at
event toting his faithful crossbow.
nd it is hard to imagine that such
havior would happen, but in the
rrent times with escalated emo-
ns over the crossbow, anything is
ssible.

In an effort to encourage more





**Taking a look at crossbows**

tournament activity, the American
Crossbow Federation (ACF) has
designed their own set of 3-D shoot
rules and are working to encourage
more folks to participate in the off-
season sport of tournament shoot-
ing. The rules are designed with the
crossbow hunter in mind by keeping
distances within ethical crossbow
ranges and stressing the taking of
only ethical shots.

We are also considering adopt-
ing a lottery system to determine the
overall winner of the tournament. If
you shoot a round, your score card
goes in the hat and at the end of the
tournament, a card is drawn from
the hat to determine the winner of
the grand prize, whatever that is. The
object is to put the fun back into the
sport and to give every shooter the
chance to be the winner regardless
of how skillful they are. Perhaps we
are going into left field here, but we
just want to encourage folks to get
out, participate and have fun with
their fellow horizontal and vertical
shooters. Of course at our tourna-
ments, all forms of archery would be
welcome.

I love what you are doing and
what you are publishing, Tim. Our
industry is badly in need of individu-
als like you. People with vision,

courage and integrity. Please keep
up the good work.

*American Crossbow Federation*
*Horizontal Bowhunter Magazine*
*Daniel James Hendricks,*
*Publisher/Editor*
*Glenwood, MN*

*Editor's Note:* If you'd like to stay
informed about crossbow issues
year-round, you can get information
about subscribing to *Horizontal
Bowhunter* Magazine by calling (320)
634-3660 or you can go on line at
www.horizontalbowhunter.com

## Apology Due Wood Arrow Manufacturers

Jay McAninch's, President of
ATA, article on "Questions and
Answers" concerning the recent
Federal Excise Tax legislation in
*Inside Archery, April 2005* needs
some very important additions. The
first being an apology to both the
archery industry and Board
Members who were not given the
opportunity to participate in any
discussions concerning Mr.
McAninch's flat tax legislation. What
is of vital concern is that democratic
principles were laid to waste. Your
entire ATA Board was not even asked



If you're not headed
TROPHY BOUND...
where are you
headed?

Ask about our
boar hunt
giveaway at
Black Mtn. Exotics
www.blackmountainexotics.com

Custom strings every archer can afford.
Guaranteed against peep rotation, serving
separating and string stretch. No charge for
custom colors. Choose TS-1 PLUS or 452X

**Expect The Best - Shoot The Best**
**Trophy Bound Bow Strings**
(715) 423-8609  www.trophybound.com
267 W. Grand Ave., Wisconsin Rapids, WI 54495

# Dear ArrowTrade...

## Continued from previous page

for their advice or comment until effective discussions were meaningless. Why should there have been a discussion? Please see the Board meeting notice I received below.

*Toll free: 866.266.2776*
*www.archerytrade.org*
*TO: ATA Board of Directors*
*FROM: Jay McAninch*
*DATE: December 2, 2004*
*SUBJECT: EMERGENCY*
*BOARD CONFERENCE CALL*
*FRIDAY-DECEMBER 3 at 2pm*
*Eastern. Dial 888-447-7153; PIN*
*1435914#*

The Board was informed Friday December 3rd and the vote was scheduled for Monday, December 6th. Congress was out of session during the weekend. The ATA Board and industry should have been fully informed in early November. The leadership of the Board had this information and elected to share it with the rest of the Board three days before the vote, but two of them were Saturday and Sunday.

As an elected Board member I was deliberately not informed of what amounted to this complete reversal of ATA's position; from an arrow FET of 12% to a .39 cent flat tax. There were other Board members who also were not communicated with, but I will let them speak for themselves. I spoke at the ATA Board meeting concerning this unacceptable governance in Louisville Kentucky on March 21st. The Board voted to unanimously support Mr. McAninch. I hope that support assumed a change in Mr. McAninch's future behavior.

What would be your reaction if the ATA was responsible for legislation that virtually put you out of business? None of the wood youth arrow manufacturers were aware of this back door tax legislation until it was enacted!

The wood youth arrow manufacturers were not even given the courtesy of a phone call. As a Board member I have apologized to: Red Feather–Jerry Crosby, Manager (210) 945-8552; Port Orford Cedar–Jerry Nishion (541) 572-6408; Shekawkin–Frank Slacik (607) 967-8333

What is important here is not what side of the issue you are on but how the game is played. An Olympic Gold medal won with the aid of drugs is no medal. Integrity must be ATA's first priority. Our trade organization must be transparent....They got their Gold Medal, but you decide on how to score it. Their actions put some members in our industry in financial jeopardy without even having a discussion with them. How would you like this to happen to you and is this really the way you want your trade organization run?

*Bob Eastman, ATA Board Member*
*CEO of Eastman Outdoors, including*
*the Eastman Outfitters*
*and Carbon Express brands*
*Flushing, Michigan*



**Kinsey's Archery Dealer Show Continues To Grow**

## Kinsey's Coverage

I finally got a few minutes to look through the latest issue containing the article covering the Dealer Show. All I can say is Wow!! What great coverage!! I've fielded at least ten calls this week from manufacturers and reps who are mentioned in the article who were all very pleased with the exposure they received in the article. I can't thank you enough for all the support you have shown us covering the Dealer Show. We have some pretty exciting new things in the works for the 2006 Show, I'll fill you in when they are carved in stone.

Thanks again,
*David B. Parker C.P.M.*
*Purchasing Manager /Sales Manager*
*Kinsey's Archery Products,Inc.*

## Archery In The Schools

We are a supplier and supporter of the National Archery in the Schools Program (NASP). They have been using our six bow model with the accessory floor stand for indoor use. The six bow (6BH) can be used outside without the floor stand using the self-driving design that comes standard with it.

I have also become one of the first NASP instructors in Wisconsin. I think Roy Grimes and everyone else involved with the program have done a great thing for the kids and we are proud to be part of it. It's great to see kids doing something that they haven't done before. They're having a blast doing it and they don't need a 120 volt outlet or batteries.

*Tony Berg, President*
*Archery Shooter Systems*
*Endeavor, WI*

*Editor's Note:* Opinions expressed are those of the writers. Share your thoughts on everything from ArrowTrade's issues to issues facing the industry or sport by sending Email to atrade@ecenet.com or mail to 3479 409th Ave. NW, Braham, MN 55006.

September 2005

# All About Arrows

**ultra-light carbon shafts to flatten trajectory**

**heavy-weights for big & dangerous game**

**mid-weights for most customers**

**new options in fletching**



D



**A T A**
**A S S O C I A T I O N**   Toll free: 866.255.2776  www.archerytrade.org

### *Board of Directors Informational Conference Call*
### *Thursday, September 15, 5:00 p.m. Eastern*

**Attending:** Scott Alread, Michele Eichler, Peter Gussie, Bruce Hudalla, Bob Ives (Goldtip), John Larsen, Dennis McCarthy (PSE), Malcolm Snyder, Steven Sims, Todd Vaaler, Randy Walk (by proxy to Laverne Woock), Erik Watts, Tim Whiteford and Laverne Woock.

**Absent:** Chuck Jordan, Bob Eastman

**Staff:** Kelly Kelly and Jay McAninch

**Guests:** Edward "Sunny" Cameron

The informational conference call began at approximately 5:00pm. Watts asked if everyone had received the draft memorandum and bulletin that related the Executive Committee decision regarding Eastman's conduct. Ives indicated that he did not see the email so Kelly sent it to Ives for review.

Watts reviewed:
1) the time line of activities by the Executive Committee since the last Board meeting and the subsequent publication of Eastman's letter in ArrowTrade;
2) the August 29, 05 email to Eastman from Woock following a telephone discussion;
3) the September 7 Executive Committee conference call with Cameron to discuss his legal opinion regarding the Eastman letter and conduct;
4) Kelly's call to Monica Whitburn to find a time for the Executive Committee to have a conference call with Eastman and Eastman's refusal to give Kelly a time or date for the call as he preferred to speak with the Executive Committee one-on-one;
5) Woock's call with Eastman regarding the informal request of the Executive Committee that Eastman send a retraction to his ArrowTrade letter and Eastman's refusal to retract his letter;
6) Woock's email confirming the discussion with Eastman and the results of his refusal as per the ATA Bylaws and Rules of Conduct;
7) Vaaler's call to Eastman regarding the letter and discussions about the Executive Committee decision; and,
9) Eastman's letter as a result of that discussion and asking for additional information regarding the topic of his letter.

The Executive Committee conference call on Tuesday, September 13 resulted in a decision to issue a memo and bulletin to Eastman, describing the Executive Committee's unanimous determination of the disciplinary action to be taken in this matter. The Executive Committee also decided to inform the Board of their decision and to share copies of the memo and bulletin to be sent to Eastman. The memo and bulletin were sent to all Board members,

E



**ARCHERY TRADE**

**A S S O C I A T I O N**    Toll free: 866.266.2776 www.archerytrade.org

To:     Bob Eastman, ATA Director and CEO of Eastman Outdoors

From:  ATA Executive Committee

Re:     *Arrow Trade* Letter

Date:  September 16, 2005

---

The purpose of this Memorandum is to communicate the ATA Executive Committee's unanimous determination that your letter which was published in the most recent edition of *Arrow Trade* is violative of the ATA's Rules of Conduct and otherwise constitutes conduct which is materially and seriously prejudicial to the ATA's purposes and interests.

Laverne Woock and Todd Vaaler have both spoken with you to explain our position, ask you to retract your letter, and the consequences of your recent behavior and refusal to issue a retraction. You have declined our request that you retract the letter in its entirety. To provide you with a final opportunity, we have prepared the attached Bulletin for you to consider approving (and signing) for distribution throughout the industry.

In the event you reconsider your position by agreeing to this retraction, your company's ATA membership and your Board seat will remain unaffected, except that your company's membership status will be probationary in nature through December 31, 2006 and that any further violations will trigger the expulsion procedures set forth in Sections 4.05 and 4.07 of the ATA Bylaws.

If you continue to refuse to sign and issue the Bulletin, your company's membership may be suspended in accordance with Sections 4.06 and 4.07 of the ATA Bylaws. Based on your refusal to Laverne and Todd to consider any retraction, this memorandum is your 15 day notice of the suspension of your ATA membership resulting in your immediate removal from the ATA Board. Please provide us with your written response by September 26, or contact Kelly Kelly to coordinate timing for a hearing with the entire Board the week of September 26-30 (via conference call).

F

F